# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RAUL CANTU, JR.,**

                         **Plaintiff,**

           **v.**                                                        **Case No. 19-CV-1003**

**VENTURA FOODS, LLC,**

                         **Defendant.**

---

## DECISION AND ORDER

---

**1. Facts**

Ventura Foods, LLC manufactures custom dressings, sauces, mayonnaises, and other food solutions at facilities throughout the United States, including in Waukesha, Wisconsin. (ECF No. 23, ¶ 1 [1].) Its policies provide for a workplace free of discrimination and harassment. (ECF No. 23, ¶ 3.) Ventura's policies provide that employees who feel

---

[1] Cantu's responses to Ventura's proposed findings of fact generally do not comply with Civil Local Rule 56(b)(2)(B). He failed to respond to many of the proposed findings of fact, in contravention of Civ. L.R. 56(b)(2)(B)(i). As a consequence, all facts to which he did not respond are deemed admitted. Fed. R. Civ. P. 56(e)(2). When Cantu did respond, often the only authority he cited were his own proposed findings of fact. That is not sufficient, and all facts to which a dispute was not supported by a proper citation to evidence are deemed admitted. *See Perkins v. Cnty. of Milwaukee*, No. 18-CV-179-JPS, 2018 U.S. Dist. LEXIS 201926, at *2-6 (E.D. Wis. Nov. 29, 2018), *aff'd* 781 F. App'x 538 (7th Cir. 2019). However, these errors do not appear to have materially affected the outcome of this motion.

they have been subject to discrimination or harassment should immediately report their concerns. (ECF No. 23, ¶ 4.)

Raul Cantu began working at Ventura in 2006 as a production employee. (ECF No. 23, ¶ 5.) By the end of the year, John Schmidt, Ventura's Controller and Finance Manager (ECF No. 23, ¶ 9), promoted Cantu to Inventory Control Lead. (ECF No. 23, ¶ 8.) Schmidt again promoted Cantu in 2014 to Accountant. (ECF No. 23, ¶ 10.) In this new role Cantu was now a salaried employee. (ECF No. 23, ¶ 10.) Schmidt remained Cantu's supervisor, and Cantu managed three "cycle counter" employees. (ECF No. 23, ¶ 12-13.)

In 2017 Ventura relocated Cantu's workspace to a cubicle that was about 20 feet away from where he previously worked but which was closer to the bathroom and a supply closet. (ECF No. 23, ¶¶ 34, 36.) In this new location Cantu was bothered by smells, the noise associated with the supply closet door that was opened and closed two to three times a day, and bright lights. (ECF No. 23, ¶¶ 34, 37.) Cantu complained but did not receive a satisfactory response. (ECF No. 23, ¶ 38.)

In January 2018 Schmidt decided to change Cantu from a salaried employee to an hourly employee. (ECF No. 23, ¶ 41.) Schmidt believed that Cantu's responsibility more closely aligned with those of an hourly Lead Inventory Control position rather than those of an Accountant. (ECF No. 23, ¶ 42.) He also believed that Cantu was taking advantage of being a salaried employee by coming in late, taking long lunches, and

2
Case 2:19-cv-01003-WED   Filed 04/01/21   Page 2 of 20   Document 37

leaving early. (ECF No. 23, ¶ 42.) This change required approval from officials at Ventura's corporate offices in California, and in March 2018 Ventura's local human resources manager, Karen Mattes, discussed the change with corporate officials by email. (ECF No. 36, ¶ 24.) On April 30, 2018, Mattes followed-up and asked if Cantu could be converted to an hourly employee effective June 1, 2018. (ECF No. 36, ¶ 29.) Mattes believes she received corporate's approval for this change, and it became effective June 1. (ECF No. 36, ¶ 29.)

On March 18, 2018, Cantu filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging he was discriminated against on the basis of his age and national origin when he was not interviewed for a position as a manufacturing manager and not provided certain training opportunities. (ECF No. 23, ¶ 46.) Cantu was not interviewed for the position because, by the time he submitted his application, Ventura had already chosen a person for the job. (ECF No. 23, ¶ 50.) The EEOC complaint did not involve Schmidt in any way. (ECF No. 23, ¶ 47.) Ventura first received notice of Cantu's complaint by way of a letter dated April 25, 2018. (ECF No. 36, ¶ 28.) Schmidt did not learn of the complaint until May 2018. (ECF No. 36, ¶ 28.)

On May 31, 2018, Cantu received his 2018 performance review from Schmidt, who rated Cantu's performance as "did not meet expectations." (ECF No. 36, ¶ 31.) Cantu had up to this point received only positive performance reviews. (ECF No. 36, ¶ 32.) Schmidt's rating was based, in part, on his view that Cantu needed to take more

3
Case 2:19-cv-01003-WED   Filed 04/01/21   Page 3 of 20   Document 37

action in meetings. (ECF No. 36, ¶ 33.) Cantu, however, believed he had met all the expectations outlined in his 2017 performance review. (ECF No. 36, ¶ 34.)

The following day, June 1, 2018, Schmidt informed Cantu that he would now be an hourly employee. (ECF No. 36, ¶ 37.) No other employee was changed from a salaried to an hourly employee (ECF No. 36, ¶ 38), and Cantu was not told why the change was made or who made the decision (ECF No. 36, ¶ 37). Although Cantu's title did not change, Schmidt assigned him additional responsibilities. (ECF No. 36, ¶¶ 39, 40.) Cantu, who had worked about 50 hours per week as a salaried employee (ECF No. 23, ¶ 24), felt he was not going to be able to complete his existing responsibilities and his new responsibilities without working overtime (which he was told he could not do) and, therefore, was being set up for failure. (ECF No. 36, ¶¶ 41, 42.) This caused him stress. (ECF No. 36, ¶¶ 45, 46.)

Hourly employees were generally required to take a full 30-minute lunch, verified by punching in and out on a time clock, or else get a supervisor's approval to work through lunch. (ECF No. 36, ¶ 53.) Cantu, since becoming an hourly employee, usually took only a 10-minute lunch break. (ECF No. 36, ¶ 54.) On July 16, 2018, at about 7:30 AM, Schmidt sent Cantu an email that stated, "You need to take a lunch that registers." (ECF No. 36, ¶ 50.) Cantu responded, "Is once a week okay?" (ECF No. 36, ¶ 55.) Schmidt replied, "At least 3 days." (ECF No. 25-1 at 180.)

Cantu responded to Schmidt, "Is this the same rule for everyone? I know there are non-union hourly employees who do not even punch out for lunch." (ECF No. 36, ¶ 58.) Schmidt wrote back, "The rule is every day unless you get approval by your supervisor. If there is an issue see HR." (ECF No. 36, ¶ 58.) Cantu did so, forwarding the string of emails to Mattes in Ventura's Human Resources department, stating, "I know there are non-union hourly employees who take short lunches constantly or do not even punch out for lunch without a supervisor/manager approval. I do not appreciate being harassed over this issue." (ECF No. 36, ¶ 60.)

Later that afternoon, in a pair of emails a few minutes apart, Mattes wrote to Cantu, "This is the rule and I have communicated this to our supervisors over the 3 years that I have been here. Here is the communication that I have sent in 2015, 2016 and 2018. John is just doing what I have requested. If you have any questions, please let me know." (ECF No. 25-1 at 182.) Four minutes later she added, "Also, I will ask [my assistant] to audit the lunch punches going forward for all employees. Thank you so much!" (ECF No. 25-1 at 179.) Two minutes later Cantu responded to Mattes, "I can see that it is the rule, but this rule is broken by other non-union hourly employees constantly. I don't appreciate being targeted now that I have been switched from salary to hourly." (ECF No. 25-1 at 181-82.)

As a result of his exchange with Schmidt, Cantu felt he was being targeted and under increased scrutiny. (ECF No. 36, ¶ 61.) Nonetheless, he did not punch out for a

full half-hour lunch that day. (ECF No. 36, ¶ 68.) At the end of the day, at 5:21 PM, Cantu received an email from Schmidt that stated, "See me in the morning before 8:30. Punching out and then back in 13 minutes later doesn't do anything. The lunch needs to be 30 minutes unless you have my approval." (ECF No. 25-1 at 30, 114:11-14.) Cantu felt that Schmidt was "upset about the situation" and "didn't think it was going to go very well" if he met with Schmidt the next morning. (ECF No. 25-1 at 29, 110:22-111:1.) So Cantu decided to quit instead of perhaps being berated or terminated by Schmidt the next day. (ECF No. 36, ¶ 68.)

2. **Procedural History**

On July 15, 2019, Cantu filed the present action. He alleges he suffered discrimination due to his Hispanic heritage in violation of Title VII, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981. He alleges that Ventura prohibited him "from working overtime and from working through lunch break and/or taking an abbreviated lunch break to complete his work although allowing non-Hispanic hourly employees to work overtime and to work through lunch break and/or take abbreviated lunch breaks." (ECF No. 1, ¶ 17; *see also id.* at ¶ 22.) He also alleges he was subjected to a hostile work environment because he "was referred to as a 'bean counter' while other Hispanics were referred to as 'beaners'." (ECF No. 1, ¶ 18; *see also id.* at ¶ 22.) He also alleges he suffered unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981. He alleges that Ventura retaliated against him for his EEOC complaint by changing him from a

salaried to an hourly employee, giving him a negative performance evaluation, and preventing him from working overtime or through lunch (ECF No. 1, ¶¶ 26, 31), leading to his constructive discharge (ECF No. 1, ¶ 26-28, 31-33).

Ventura has moved for summary judgment. (ECF No. 21.) Cantu responded (ECF No. 30), and Ventrua replied (ECF No. 35). The matter is ready for resolution. All parties have consented to the court's jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 2, 12.) The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

**4. Analysis**

Title VII of the Civil Rights Act of 1964 prohibits employers from, among other things, discriminating against employees due to the employee's race or national origin. 42 U.S.C. § 2000e-2(a). Cantu alleges he suffered discrimination due to his Hispanic ethnicity, which, he argues, constitutes a race or national origin under Title VII. (ECF No. 1, ¶¶ 20, 34 C., G.) The Court of Appeals for the Seventh Circuit has accepted that Hispanic identity may constitute a race for purposes of Title VII, *Lugo v. IBEW Local #134*, 175 F. Supp. 3d 1026, 1030 n.2 (N.D. Ill. 2016) (citing *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011); *Nelson v. Realty Consulting Servs., Inc.*, 431 F. App'x 502, 506 (7th Cir. 2011)); *see also Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016), and Ventura does not argue otherwise.

"In discrimination cases, '[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, ___, 2021 U.S. App. LEXIS 4500, *14 (7th Cir. 2021) (quoting *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

One way a plaintiff may prove discrimination is under the familiar burden-shifting approach of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Igasaki*, 2021 U.S.

App. LEXIS 4500, *14-15 (citing *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791-92 (7th Cir. 2020)).

> The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.

*Igasaki*, 2021 U.S. App. LEXIS 4500, *14-15 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

> To make a prima facie case under *McDonell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer.

*Igasaki*, 2021 U.S. App. LEXIS 4500, *15 (citing *Marshall*, 973 F.3d at 791-92). However, a plaintiff need not follow this approach. A plaintiff need only muster enough evidence that could allow a reasonable jury to find in her favor. *Id.* (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)).

Moreover, "Title VII 'makes it unlawful for an employer to discriminate against any of his employees or applicants for employment who have…availed themselves of Title VII's protections." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (in turn quoting 42 U.S.C. § 2000e-3(a))). "This provision 'seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms … by prohibiting employer actions

that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers.'" *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal quotation marks omitted).

"To succeed on a Title VII retaliation claim, a plaintiff 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Robertson*, 949 F.3d at 378 (quoting *Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017)).

Cantu also alleges parallel claims under 42 U.S.C. § 1981. "Section 1981 guarantees equal rights to all citizens regardless of race and in the context of employment provides that all people have the 'same right … to make and enforce contracts … as is enjoyed by white citizens.'" *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (quoting 42 U.S.C. § 1981(a)). Because § 1981 and Title VII "have the same liability standards," the court may assess the claims together. *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (quoting *Walker v. Abbott Lab'ys.*, 340 F.3d 471, 474 (7th Cir. 2003)). Thus, for simplicity, the court will refer only to Title VII.

**4.1. Retaliation**

There is no dispute that Cantu engaged in protected activity when he filed a discrimination charge with the EEOC on March 18, 2018. Thus, the court turns to the question of whether Ventura took a materially adverse employment action against him.

Although defined broadly, "not everything that makes an employee unhappy is an actionable adverse action. For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (citing *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)).

**4.1.1. Poor Performance Review**

Cantu argues that his poor performance review was an adverse employment action. He contends it was unfair because he was penalized for things over which he had no control. (ECF No. 30 at 4-5.) Title VII, of course, forbids retaliation, not "wrongful or even unreasonable employment actions." *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 927 (7th Cir. 2019).

But, more importantly, the Court of Appeals for the Seventh Circuit "has never held, and in fact has explicitly rejected, that poor performance reviews alone can be the basis for a finding of an adverse employment action by the employer." *Chaib v. Indiana*,

744 F.3d 974, 984 (7th Cir. 2014). Cantu has not addressed this precedent, and thus the court finds that the performance review was not an adverse employment action.

### 4.1.2. Switch to Hourly Status

Nor can Cantu's shift to an hourly employee be regarded as an adverse employment action. He acknowledges that the change did not affect him monetarily. (ECF No. 30 at 6.) His only argument that it was an adverse employment action is his speculation that the change would have negatively affected his prospects of replacing Schmidt when Schmidt retired because, by making him an hourly employee, it made it look like he was not a supervisor. (ECF No. 30 at 5-6.) But such speculation about the consequences of the change is insufficient to sustain a plaintiff's initial burden to demonstrate it was an adverse employment action. *Cf. Fischer v. Avanade, Inc.*, 519 F.3d 393, 411 (7th Cir. 2008) (finding that plaintiff's speculation about the "dead-end nature of her new position" was insufficient to support the conclusion that she would ultimately fail in the position and be terminated because she "did not provide ample time to test her hypothesis"). Moreover, no reasonable finder of fact would conclude that an employer is likely to overlook a qualified candidate simply because he is compensated on an hourly basis rather than by salary.

### 4.1.3. Additional Duties, Lunches, and Overtime

Cantu complains that, after he was switched to an hourly employee, he was assigned additional duties, generally required to punch out for a full lunch, and restricted as to how much overtime he could work.

"Whether the denial of overtime constitutes a materially adverse employment action is fact-specific." *Conner v. Bd. of Trs.*, No. 19 CV 846, 2019 U.S. Dist. LEXIS 178058, at *15 (N.D. Ill. Oct. 15, 2019). "When overtime pay or premium pay is a significant and expected part of an employee's annual earnings, denial of such pay may constitute an adverse employment action." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citing *Henry v. Milwaukee Cty.*, 539 F.3d 573, 585-86 (7th Cir. 2008); *Lewis*, 496 F.3d at 653-54). "In contrast, when extra pay is in the employer's discretion and only awarded sporadically, it is not an adverse employment action." *Conner*, 2019 U.S. Dist. LEXIS 178058, at *15 (citing *Lewis*, 496 F.3d at 653).

Cantu has not presented evidence that could support a conclusion, under established Seventh Circuit precedent, that the decision to restrict his overtime was an adverse employment action. Same, too, with respect to the related requirement that he punch out for a full lunch break.

As for the additional responsibilities he was assigned, as Ventura argues (ECF Nos. 22 at 20; 35 at 12), "[u]nder settled precedent … additional work within the plaintiff's job description is not a materially adverse employment action." *Galvan v.*

*Cmty. Unit Sch. Dist. No. # 300*, 46 F. Supp. 3d 836, 841 (N.D. Ill. 2014) (citing *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008); *Griffin v. Potter*, 356 F.3d 824, 826, 829 (7th Cir. 2004); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2003); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 686-87, 692 (7th Cir. 2001).

The additional duties that Schmidt imposed were within the scope of Cantu's job description. (ECF No. 34, ¶ 67.) Therefore, imposing them was not an adverse employment action.

However, Cantu's argument does not appear to be that any of these actions individually constituted an adverse employment action; he does not even respond to Ventura's arguments that, under settled Seventh Circuit law, none of these actions constitute adverse employment actions, *cf. Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."). Rather, it appears that his argument is that these actions collectively added up to an adverse employment action because they "made it impossible for Cantu to complete his work in a normal workday" and therefore he "was being set up to fail." (ECF No. 30 at 9.)

However, his speculation that he would fail under the new conditions is insufficient to show that the changes, either individually or collectively, constituted an adverse employment action. *See Fischer*, 519 F.3d at 411. Rather, Cantu was required to "test [his] hypothesis." *Id.* If Ventura's new expectations proved unreasonable, it could either persist in those expectations or modify them. Cantu did not allow for this process

to play out, instead resigning only a few weeks after he was shifted to an hourly employee. *See id.* ("Fischer did not provide ample time to test her hypothesis regarding the dead-end nature of her new position, since she tendered her resignation on September 30, 2005, merely a few weeks after accepting the transfer.").

Cantu also may be trying to argue that the emails Schmidt sent him about the need to take a lunch break were adverse employment actions. (ECF No. 30 at 12-13.) His theory seems to be that, because Schmidt communicated with him in writing rather than orally, the emails constituted a "written warning" or a "letter of reprimand" and are, therefore, actionable as adverse employment actions. (ECF No. 30 at 13.) To the extent Cantu is actually making this argument, the court finds no merit in it. Cantu offers no authority for the extraordinary notion that a supervisor's decision to communicate in writing makes every instructive or corrective communication an adverse employment action.

### 4.1.4. Constructive Discharge

Cantu alleges that he was constructively discharged because, based on the emails he exchanged with Schmidt, he "felt threatened, intimidated, and knew at a minimum he would be berated by Schmidt and thought he was going to be terminated the following morning." (ECF No. 30 at 14.)

"A constructive discharge constitutes an adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*,

542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)). "It occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Id.* There are two forms of constructive discharge. The first occurs when the harassment is so severe—even more egregious than that required for a hostile work environment claim—that the person feels compelled to resign. *Id*. The second form "occurs '[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated….'" *Id.* (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).

As Ventura notes, Cantu abandoned his hostile work environment claim by not addressing it in response to Ventura's motion for summary judgment. (ECF No. 35 at 5-6.) Because constructive discharge on a theory of adverse working conditions requires establishing conditions even more egregious than those necessary to establish a hostile work environment claim, *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 628 (7th Cir. 2019), Cantu's failure to present facts that could constitute a hostile work environment claim would seem to preclude him from proving this form of a constructive discharge claim.

Nonetheless, for the sake of completeness, the court acknowledges that, when addressing his constructive discharge allegations in conjunction with his retaliation claim, Cantu did discuss certain perceived slights. (ECF No. 30 at 10-11.) For example, Cantu complained about the smells, bright lights, and loud sounds he was subjected to

after his cubicle was moved. (ECF No. 30 at 10-11.) But he offers no reason the suggest that his supervisors' refusal to address his complaints was anything other than the sort of common frustration that employees routinely experience. Although this may have caused Cantu to feel stressed, especially in light of his recent health problems, such stress does not transform ordinary frustrations into an actionable hostile work environment or constructive discharge claim. *See Majors v. GE*, 714 F.3d 527, 540 (7th Cir. 2013).

Cantu also complains that three times he was called "bean counter" by Ventura's safety manager. He appears to suggest that this phrase had ethnic overtones, linking it as he does with an allegation that he once heard employees call a coworker "beaner." "Bean counter," of course, is a term for a corporate accountant, *see, e.g.*, Meriam-Webster Dictionary, bean counter, available at https://www.merriam-webster.com/dictionary/bean%20counter (last visited April 1, 2021); *see also OED Online*, Oxford University Press, www.oed.com/view/Entry/240643 (last visited April 1, 2021), which is what Cantu was. Although often derisive or pejorative, it is devoid of racial or ethnic denotation or connotation.

"Beaner," however, is generally recognized as an ethnic slur. But a single incident in which Cantu allegedly witnessed employees using this term in reference not to him but to a coworker does not come close to creating a hostile work environment. *See, e.g., Dandy v. UPS*, 388 F.3d 263, 271 (7th Cir. 2004).

These incidents, even when assessed collectively as they must, *see Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019), fall far short of the sort of extreme conduct that might be sufficient to constitute a hostile work environment, *cf. Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 606 (7th Cir. 2014) (discussing cases). Having failed to demonstrate he was subject to the lower threshold of a hostile work environment, his constructive discharge claim fails.

Cantu appears to be proceeding under the theory that his resignation was a constructive discharge because he was about to be fired. Under this theory he must still "show that his working conditions had become intolerable," *Chapin, Inc.*, 621 F.3d at 679, although the intolerability need not necessarily be in the same vein as that necessary to sustain a hostile work environment claim. For example, an employee who is told explicitly that she will be immediately fired if she does not resign is constructively discharged. *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 502 (7th Cir. 2010). Additionally, the Court of Appeals for the Seventh Circuit recognized that an employee had been constructively discharged when, after being told that her supervisor wanted her out, that an incident was "the last straw," and was told by a supervisor that it looked like she was about to be fired, she arrived at work to find her belongings packed and her office being used for storage. *Univ. of Chi. Hosps.*, 276 F.3d at 332-33. Thus, the "intolerability" may be, in large part, the imminence of termination.

However, a plaintiff's working conditions do not become "intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin*, 621 F.3d at 679 (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)). In general, employees who believe they have suffered discrimination are expected to continue working and give the employer the opportunity to address their complaints. *Id.* (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007)).

No reasonable employee in Cantu's position would have believed that his termination was imminent. *See Chapin*, 621 F.3d at 680. Cantu had worked for Ventura for 12 years, and for nearly all that time Schmidt had been his supervisor. Cantu had no history of being disciplined and was still adjusting to the new expectations associated with his status as an hourly employee when the issue about needing to take a full lunch break arose. Cantu had never been told that he was about to be fired. No one said that this was the "final straw" or anything like it. His supervisor simply wanted to talk to him.

In light of Schmidt's email requesting to see Cantu the following morning, Cantu may have, at best, reasonably suspected that he was going to be disciplined, although even that is a stretch. There was absolutely no basis for a reasonable person in Cantu's position to conclude that Ventura was going to bypass lesser forms of discipline and jump right to termination because he took a 13 rather than a 30-minute lunch break.

Cantu has not presented evidence from which a reasonable jury could conclude that he suffered an adverse employment action. Accordingly, Ventura's motion for summary judgment will be granted as to Cantu's retaliation claim.

### 4.2. Discrimination

For the same reasons his retaliation claim fails, Cantu's discrimination claim fails. The poor performance review, switch to hourly status, general denial of overtime, requirement that he punch out for a full lunch, and the addition of duties within the scope of his job description were not adverse employment actions. Nor was Cantu constructively discharged. Consequently, Ventura is entitled to summary judgment with respect to Cantu's discrimination claim.

### 5. Conclusion

**IT IS THEREFORE ORDERED** that Ventura Foods, LLC's motion for summary judgment (ECF No. 21) is **granted**. Raul Cantu, Jr.'s complaint and this action are hereby dismissed with prejudice. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 1st day of April, 2021.

_WILLIAM E. DUFFIN_
WILLIAM E. DUFFIN
U.S. Magistrate Judge